PROXIMITY MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26903, 32371.   Promulgated January 8, 1930.

*E. S. Parker, Jr., Esq.*, for the petitioner.
*Paul L. Peyton, Esq.*, for the respondent.

OPINION.

TRAMMELL: These are proceedings for the redetermination of deficiencies in income tax for the calendar years 1922, 1923, 1924, and 1925, in the amounts of $15,194.07, $15,030.60, $5,952.72, and $11,280.04, respectively. The proceedings were consolidated for hearing and decision, and the issue raised by the pleadings involves the respondent's action in disallowing certain deductions claimed on account of depreciation. The petitioner complains that the respondent erroneously disallowed reasonable deductions claimed by it for depreciation in the taxable years, on the theory that the depreciation disallowed was claimed on " exhausted assets." The petitioner contends also that numerous expenditures made in prior years for capital assets were erroneously charged to expense, and should be restored to its capital account for the purpose of computing depreciation allowances.

The Revenue Act of 1921, which has application here with respect to the taxable years 1922 and 1923, provides in section 234 (a) that in computing the net income of a corporation, there shall be allowed as deductions:

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

In the case of such property acquired before March 1, 1913, this deduction shall be computed upon the basis of its fair market price or value as of March 1, 1913.

The Revenue Act of 1924, which governs the taxable years 1924 and 1925, provides in section 204 that the basis upon which depletion, wear and tear, and obsolescence are to be allowed in respect of any property acquired after February 28, 1913, shall be the cost of such property; and in respect of property acquired before March 1, 1913, the basis shall be (a) the cost of such property, or (b) the fair market value of such property as of March 1, 1913, whichever is greater.

A reasonable allowance for depreciation is such an amount, allowed annually, as the capital assets are consumed or used up in the trade or business, as will enable the taxpayer to recover at the end of their useful life, the amount of his investment therein or the March 1, 1913, value, tax free. *Even Realty Co.*, 1 B. T. A. 355; *William Harris, Jr.*, 2 B. T. A. 156; *R. E. Snell, Jr.*, 10 B. T. A. 1081.

The determination of what constitutes a reasonable allowance must depend upon the facts in each case, and, obviously, before we can say that the deductions allowed by the respondent in this case are insufficient and therefore unreasonable, we must be able, from the evidence before us, to compute allowances that would be reasonable and in compliance with the statute.

The issue here involves two classes of assets, namely, (1) those assets which, it is alleged, were erroneously charged to expense and should now be restored to capital account, and (2) those which are referred to as " exhausted assets."

The petitioner is a corporation, organized in 1895, and the expenditures for capital assets alleged to have been charged to expense, and which the petitioner now seeks to restore to capital account for depreciation purposes, were made in the years from 1896 to 1916, both inclusive. Apparently the capital assets with respect to which respondent refused to allow deductions for depreciation in the taxable years on the theory that the depreciable values had been theretofore fully exhausted were also acquired during the same period.

The issue presented raises two specific questions, which will be considered in the order stated, namely, (1) whether the petitioner is entitled to additional allowances for depreciation in the taxable years on assets, the original cost of which was erroneously charged to expense and should now be restored to capital account, and (2) whether the petitioner is entitled to additional allowances for depreciation on so-called " exhausted assets."

In relation to the first question, the record discloses that in 1920, the respondent made an examination and investigation of the peti-

tioner's books and records, and at that time restored to capital account items previously charged to expense in the total amount of $866,566.13. The petitioner now contends that additional items should be restored in the amount of $791,953.13.

Bernard M. Cone, president of the petitioner, testified at length concerning the practice of the petitioner in charging capital expenditures to expense. It is shown that prior to 1917 a very conservative policy of bookkeeping was followed. Large amounts of money representing capital expenditures were charged to expense in said years, and it seems to have been the policy of the petitioner's president to authorize the charge-off of various capital accounts at the close of each year. This policy apparently was adopted for the purpose of keeping the local tax assessments as low as possible. Cone's testimony, however, is in general terms and too indefinite to enable us to find that the amount claimed, or any specific amount, should be restored to capital for depreciation purposes.

In addition to the testimony of Cone the petitioner offered in evidence a report or statement prepared by the witness Terry, a certified public accountant, setting forth the purported capital expenditures made in each of the years from 1896 to 1916, both inclusive, in the aggregate amount of $791,953.13, which the petitioner claims were erroneously charged to expense and have not been restored to capital account by the respondent. The respondent objected to the admission in evidence of said report for the reasons (1) that the subject is not one in which opinion evidence may properly be received, and (2) that in any event the witness was not qualified to express an opinion on the subject. The objection of the respondent was sustained for the reasons indicated.

It appears that the said report contains nothing more or less than a summarized statement of the total amount of expenditures, which, in the opinion of the accountant, constituted capital investments, that is to say, expenditures which resulted in the acquisition of depreciable assets having a life of more than one year. Whether or not exhaustible assets were in fact acquired by the petitioner as the result of such expenditures is the precise question before the Board for decision, and this question could be decided by us upon proof of the kind or character of assets acquired, the cost and dates of their purchase, and the periods of useful life.

It also further appears from the testimony of the accountant that he was not qualified in any event to express an opinion on the subject. He was not present and had no connection with the petitioner's business during the years in which the expenditures were made, and had no personal knowledge as a basis for making the apportion-

ments between capital and expense. The information upon which he predicated his report or statement was obtained either from the records of the petitioner or from what other persons told him. While his report purported to show the aggregate amount of expenditures made in each year for assets having a life of more than one year, yet he testified that he did not know the life of the items included therein. His testimony on this point follows:

Q. Do you know the life of the items that you have taken out of the expense account and proposed to treat as capital expenditures?

A. Hardly, no sir.

Q. Then you do not know whether the life of these various items would be one day or one year or ten years?

A. Of course. Nothing goes in a cotton mill that would not last one day.

\* \* \* \* \* \* \*

Q. But you do not know the life of these items that you have taken out of the repair account and proposed to set up as a capital account.

A. No, sir, I could not state with any exactness the life of them.

The expenditures set up in the accountant's report as representing the acquisition of capital assets were distributed under the general headings " lumber, brick, cement-stone-sand, paint and glass, roofing material, sewers and gutters, plumbing and sheet metal, sprinkler and heating systems, bobbins-spools-shuttles-heddles-reels, card clothing, belting and rope, electrical wiring and equipment, identified labor, miscellaneous machine parts, known new equipment."

The aggregate of these various items in the amount of $791,953.13 is the amount which the petitioner seeks to have us restore to capital account for the purpose of computing additional allowances for depreciation in the taxable years. However, the evidence does not establish that the items in fact represent capital assets, or if they constituted capital assets in the years of purchase, it is not shown that they were not discarded or worn out prior to the beginning of the first taxable year. As an example, the expenditures made for lumber, brick, cement, stone, sand, paint, and glass may have been wholly or in part for repairs and properly chargeable to expense, or the expenditures in the early years for bobbins, spools, shuttles, heddles, reels, miscellaneous machine parts and other items may have resulted in the acquisition of assets that were worn out and replaced long prior to the years here involved. The evidence does not enable us to determine the periods of useful life of these alleged assets.

Again, the amount which the petitioner seeks to have restored to capital account includes large sums for " identified labor." Apparently this item of " identified labor " represents a segregation or allocation of the labor account between expense and capital, that part of the labor used in the installation of machinery being allocated to capital. With respect to the segregation of the labor ac-

count, the witness Cone, president of the petitioner, testified as follows:

Q. Can you answer my question from your books as to whether it is possible to segregate the time spent by the laborers in installing machinery from other time?

A. It is absolutely impossible with accounting methods and from an accounting standpoint to segregate that labor. The only way I see it could be gotten out is through figuring what it would at that time have cost to do this.

Apparently for the purpose of supporting or corroborating the accountant's report, above referred to, the petitioner introduced in evidence a retrospective appraisal, made in 1921, designed to show the depreciated cost of its property as of December 31, 1916, in connection with which A. S. Bedell, the engineer who made the appraisal, testified. The method of making the appraisal is disclosed by Bedell's testimony as follows:

Q. After making such examinations, did you make up an appraisal showing the depreciated cost value as of Dec. 31, 1916, of the structures, machinery and equipment going to make up the Proximity Mfg. Co.?

A. Yes, our appraisal was the cost estimate of their fixed assets. We did not include any quick assets of any sort, but everything that should have been charged to capital account.

Q. How did you arrive at the cost of the various items?

A. In so far as we could they were taken directly from the mill's contract files and invoice files. In such cases where the original information was not available, we went back to the manufacturers of the equipment and got prices from them as of the date at which it was purchased. In buildings, we used our own records for buildings that were built at that time and checked it with information from the various contracting firms who were doing business in this part of the country at the time these buildings were built.

Q. How did you arrive at your December 31, 1916 value, when you made an examination of the structures and machinery in 1921?

A. We determined the depreciation that had occurred by an examination and then from that worked back in a straight line to the condition the equipment would have been in as of Dec. 31, 1916.

Q. In arriving at the rate that should be charged for depreciation, do you consider the entire life of the structure and machinery or do you consider the useful life?

A. We base the depreciated value on the percentage of the useful life remaining.

The so-called appraisal purports only to show the depreciated cost at December 31, 1916, and even if we should accept it as satisfactory proof of all it purports to establish, the information disclosed is insufficient to enable us to compute the depreciated cost at March 1, 1913, since neither the rate of depreciation nor the date of purchase of certain items is shown. Also, it is self-evident that the appraisal report does not prove or tend to prove the fair market price or value at March 1, 1913. This document, therefore, does not establish any fact essential to a determination of the issues presented. Nor does

other testimony in connection therewith enable us to find either the cost or the March 1, 1913, value of the assets.

In addition, there are other serious objections going to the evidentiary weight of the appraisal report. In many respects, it consists of purely speculative estimates, as indicated by Bedell's testimony above quoted, which do not constitute a sound basis for determining costs. *J. C. Blair Co.*, 11 B. T. A. 673. Also, the dates of purchase of many items entering into the report are not shown, and not even estimates are given of their periods of useful life. Aside from the appraisal report, petitioner's evidence is vague, indefinite and unsatisfactory respecting the periods of useful life of the assets, and tends to call in question the correctness of said appraisal. For example, Bedell's oral testimony fixes the rate of annual depreciation of machinery similar to that of the petitioner at 5 per cent, which would indicate 20 years as the period of useful life. Yet the appraisal report prepared by this witness contains items of machinery on which the depreciation was computed at $2\frac{1}{2}$ per cent to 3 per cent, indicating periods of useful life running from $33\frac{1}{3}$ to 40 years.

The petitioner could have maintained accurate records from which the essential facts might have been ascertained. This it did not do and we are unable to accept the appraisal report, in connection with the other indefinite and conflicting evidence adduced, as a basis for disapproval of the respondent's determinations. Other reasons which prompt us to reach the same conclusion will be briefly referred to.

Bedell was the only witness who attempted to fix any definite rate of depreciation on the petitioner's assets. He testified that the "rate of depreciation generally charged and allowed by the Government on machinery similar to the machinery of the Proximity Manufacturing Company for normal day run" was 5 per cent; that the rate of depreciation generally taken and allowed on brick structures, such as those owned by the petitioner, was 2 to 3 per cent, and that the rate of depreciation generally taken and allowed on tenement construction, such as that owned by the petitioner, was 4 to 5 per cent.

With respect to the useful life of other assets, the witness testified:

Q. Based on your experience and observation, what is the average life of card clothing?

A. To answer that question, I will have to modify it a little bit. It depends entirely on the character of cotton you are running and how fast you are running your cards and as to what product you are making. In this particular mill, on denims I should think the life of the card clothing would be from eight to ten years.

Q. Do you know the useful life of roving cans, bobbin boxes and doffer boxes, and such like equipment?

A. That depends entirely upon the type of bobbin boxes bought. It should last from four to six years, but there are various kinds on the market; some last longer and some do not last that long.

The testimony of this witness, if accepted as establishing the correct rates of depreciation applicable to the assets mentioned, forms no basis for holding that the respondent erred in his determinations. The record does not disclose the rates applied by the respondent for the years 1923, 1924, and 1925. For those years the deficiency letter shows only the amounts of depreciation claimed by the petitioner and the amounts disallowed by the respondent. However, for 1922, the deficiency letter shows that the respondent computed depreciation on the petitioner's machinery and equipment at the rate of 5 per cent, on brick buildings at 2 per cent, on wood buildings and warehouses at 4 per cent, furniture and fixtures at 10 per cent, roads and bridges at 5 per cent, and autos and trucks at 25 per cent. Thus, it appears that the rates used by the respondent in his computation of depreciation deductions for 1922 are substantially in accord with the testimony of the petitioner's witness, Bedell, in so far as they relate to assets referred to in said testimony, and it is not shown that the respondent did not use the same rates for the other years involved.

In *J. C. Blair Co.*, *supra*, we had before us a similar situation to that presented here. In that case the petitioner sought to have restored to its capital account expenditures charged to expense for items entering into the composition of its design plant, including " segregated labor." There, as here, the petitioner offered in evidence a retrospective appraisal or ascertainment of depreciated costs. In the course of our opinion, at page 681, we said:

The fact that expenditures made in the development or creation of capital assets were concurrently charged to expense and deducted from income does not bar their restoration to capital, if the amounts of the expenditures and the fact that they were capital expenditures are established by satisfactory evidence. And the fact that such expenditures were erroneously charged to expense and deducted from income does not constitute the exercise of a binding option, which will prevent their restoration to capital (citing prior decisions).

However, we were impelled in that case to deny relief to the petitioner because of insufficient evidence to establish the essential facts indicated, and in affirming the judgment of the Board, the Circuit Court of Appeals for the Third Circuit, in its opinion filed September 10, 1929, stated:

In view of the taxpayer's long continued prior practice, of the non-existence of justifying evidence in the books and lack of personal and scientific knowledge of the witness above named, and also of Rymer, the auditor of the company, we find no error in the conclusion reached by the Tax Board. Moreover, the utter futility of the taxpayer's effort to apportion items of salary and wages between expense and plant construction will be seen when its books contain no record of the time spent on each. It was possible for the company to have kept an accu-

rate record of the time of each employee spent on plant and expense. This, as we have said, it did not do, but for a long period of years charged all labor and salary items to expense. To apportion them now is but to guess.

It remains to consider the item of $300,000, March 1, 1913, valuation of the " design plant " claimed by the taxpayer as a basis for computation of depreciation thereon. In principle such contention is disposed of by what has been already said, for there is no proper proof to fix such value.

.We have consistently recognized the principle that expenditures for capital assets erroneously charged to expense in prior years may in a proper case be restored to capital account for depreciation purposes. *Coatesville Boiler Works*, 9 B. T. A. 1242; *J. C. Blair Co.*, *supra*.

. But depreciation is a question of fact (*Cleveland Home Brewing Co.*, 1 B. T. A. 87) and the burden is upon the taxpayer to establish the facts necessary to compute the amount of depreciation to which he is entitled. Otherwise, we can not say that the Commissioner erred in his determination of the amount allowed. *Thomasville Ice & Manufacturing Co.*, 9 B. T. A. 1006. On the first point in the instant case, the petitioner has not established the essential facts, and there is no basis for disapproval of the respondent's determination. *Louis Titus*, 2 B. T. A. 754; *Monotype Typesetting & Foundry Co.*, 2 B. T. A. 1312; *B. G. Adams*, 5 B. T. A. 113; *William T. Reynolds Co.*, 6 B. T. A. 16; *C. W. Carey*, 6 B. T. A. 539.

The second and principal complaint of the petitioner herein relates to the action of the respondent in denying deductions for depreciation claimed on what are referred to as " exhausted assets." However, the evidence adduced does not identify the particular assets involved, nor is it shown that they were in use during the taxable years, or when they were purchased, what they cost, the period of useful life, and in the case of property acquired before March 1, 1913, the cost as of that date, the fair market price or value as of that date, and the remaining period of useful life. Nor does the petitioner attempt to show that the amount of the cost or March 1, 1913, value of such assets was not fully returned to it by way of depreciation deductions prior to the taxable years. There is no direct evidence that said property, either in whole or in part, had not been replaced, because worn out or obsolete, prior to the taxable years.

In *Alpin J. Cameron et al.*, 8 B. T. A. 120, we said at page 129, *et seq.:*

On a consideration of this question, the Board is of the opinion that the fact of the existence of the assets and their continued use in the business is not alone sufficient to justify a depreciation allowance in the taxable years, but that due regard must also be had to the extent to which recovery has already been had of their value on March 1, 1913, of assets acquired prior thereto, and of costs of assets acquired subsequent to this date. Depreciation at best is an estimate. *Pierce-Arrow Motor Car Co.*, 2 B. T. A. 396. Its purpose is to provide a return of capital before taxing income. *Richmond Dairy Lunch,* 1

B. T. A. 876; *Gladding Dry Goods Co.*, 2 B. T. A. 336; *United States* v. *Ludey*, 274 U. S. 295.

\* \* \* \* \* \* \*

\* \* \* The Board will not lightly conclude that deductions from gross income in prior years through allowances for exhaustion, wear and tear of property used in the trade or business were unwarranted and excessive, and direct adjustment thereof so that a taxpayer may in subsequent years secure the benefit of a greater deduction from income for exhaustion, wear and tear than to which he would otherwise be entitled. \* \* \* And, when a taxpayer claims that the Board should go back and redetermine the useful life of the property and recompute the depreciation allowance over a long period of years long since barred by the statute of limitations, so that he may obtain a greater deduction from income in the taxable year, and in fact obtain the benefit of a double deduction from income, he must satisfy the Board by clear and convincing evidence that he is in justice entitled to such adjustment. The allowance of the deduction from income for exhaustion, wear and tear of property is for the benefit of the taxpayer and 'when he has been given a liberal allowance in prior years, when the tax rates were high, he should not be heard to say upon a mere showing that in the taxable years the property is still in use and giving good service, that the depreciation claimed and allowed after a full consideration of the facts in prior years should be disregarded and an allowance made which will permit of the exhaustion of the same or a portion of the capital investment the second time. \* \* \*

See also *Even Realty Co., supra.*

While we recognize the principle that the erroneous allowance of excessive deductions for depreciation in prior years will not, solely on that account, preclude the allowance of a reasonable deduction in a subsequent taxable year, we must be convinced from a preponderance of the evidence that the taxpayer is entitled to the relief sought. In the instant case the petitioner has failed to present evidence from which we can determine the facts necessary to compute deductions from income for the taxable years on account of exhaustion, wear and tear of property used in its business. We can not, therefore, say that the deductions allowed by the respondent are erroneous. Accordingly, the determinations of the respondent are approved.

*Judgment will be entered for the respondent.*